UNITED STATES of America, Plaintiff,

v.

COUNTY BOARD OF ARLINGTON COUNTY; Arland Towers Company, a Virginia Corporation; Twin Development Corporation, a Virginia Corporation; 1300 North 17th Street Associates, a Virginia Limited Partnership; Theodore B. Gould, an Individual, Defendants.

Civ. A. No. 78–872–A.

United States District Court,
E. D. Virginia,
Alexandria Division.

Feb. 19, 1979.

---

Thomas K. Berger, Asst. U.S. Atty., Alexandria, Va., for plaintiff.

W. Curtis Sewell, Alexandria, Va., for Rosslyn Center Associates, Rosslyn Center Development Corp., Rosslyn Center Realty, Inc., Zupnik-Rosslyn Ltd.

Jerry K. Emrich, County Atty., Arlington, Va., for Bd. of Supervisors.

Robert T. Lasky, Washington, D.C., for Twin Development Corp., 1300 North 17th St. Associates, Theodore B. Gould.

Grayson P. Hanes, Fairfax, Va., for Arland Towers Co.

MEMORANDUM OPINION AND ORDER

OREN R. LEWIS, Senior District Judge.

The United States brought this suit for declaratory and injunctive relief against Arlington County, Virginia; Arland Towers Company; Rosslyn Center Development Corporation; Twin Development Corporation; and Theodore B. Gould, to prevent the construction of four high-rise office buildings and one hotel in the Rosslyn section of the County—on the grounds of illegal zoning and federal common law nuisance.

The complaint alleges that the Secretary of the Interior is charged by law to conserve the scenery and the natural and historical objects [in the parks and monuments] and to provide for the enjoyment of the same in such manner and by such means as will leave them unimpaired for the enjoyment of future generations and—

As guardian of our national parks, the Secretary has a constitutionally and Congressionally-based mandate to protect the rights of the public in the parks which he deems threatened by this commercial development in Arlington County.

That through the National Capital Planning Commission the United States is charged with preserving the historical and natural features thereof by, among other things, maintaining the open space requirements along the Virginia shoreline that L'Enfant intended as a most important segment of the green backdrop of the monuments of the Capital.

That the United States owns property in both Arlington County, Virginia and the District of Columbia upon which are memorials and monuments revered by all American citizens.

That the buildings for which the site plans were unlawfully approved will soar high above the present Rosslyn skyline.

That they will present visual intrusions to the enjoyment of such areas as the Lincoln Memorial, the Washington Monument, the Theodore Roosevelt Memorial, the John F. Kennedy Center, and other park lands in the District of Columbia, and the Arlington National Cemetery and the Iwo Jima Ma-

rine Memorial in Arlington County, Virginia.

That the traffic generated as a result of the density and building heights greater than permitted under the Arlington County Ordinances will also have an adverse impact on traffic conditions on the George Washington Memorial Parkway located, in part, in Arlington County.

That by reason of the foregoing, the interests of the United States and its people have been and will be injured through the visual intrusion of the defendants' buildings on the memorials, monuments and parks of our Nation's Capital, and by the increased traffic and congestion resulting from the use of the buildings constructed under the unlawful site plans of development and in violation of the zoning ordinance of Arlington County, and the laws of the State of Virginia.

Jurisdiction pursuant to 28 U.S.C. § 1345 was not seriously questioned.

The defendants denied all of the Government's charges and asserted numerous grounds of defense, including standing—estoppel—laches—and the Virginia [zoning] statute of limitations.

After the United States' motion for a temporary restraining order was heard and denied—the Government dismissed the Rosslyn Center Development Corporation, as a party defendant without prejudice (the Rosslyn Center Building was about ready to be topped out).

The test for determining whether the United States or any person has standing to sue is stated in *Arlington Heights v. Metro Housing Corp.*, 429 U.S. 252, 97 S.Ct. 555, 50 L.Ed.2d 450 (1977). The Supreme Court said, at page 260-261, 97 S.Ct. at 561:

The essence of the standing question, in its constitutional dimension, is "whether the plaintiff has 'alleged such a personal stake in the outcome of the controversy' [as] to warrant *his* invocation of federal-court jurisdiction and to justify exercise of the court's remedial powers on his behalf." * * * The injury may be indirect, [citation omitted] but the complaint must indicate that the injury is indeed fairly traceable to the defendants' acts or omissions.

■ The United States has alleged such a personal stake in the outcome of this controversy—it is the property of the United States, its parks, memorials and monuments held for the use and enjoyment of the citizens of this country that will be adversely affected by defendants' actions.

Although as a sovereign the United States may not be sued * * * they may bring suits to enforce their contracts and protect their property, in the State courts, or in their own tribunals administering the same laws. As owner of property in almost every State in the Union, they have the same right to have it protected by the local laws that other persons have. *See Cotton v. United States*, 52 U.S. 229, 231, 11 How. 229, 13 L.Ed. 675 (1880).

The Supreme Court in *In Re Debs*, 158 U.S. 564, 15 S.Ct. 900, 39 L.Ed. 1092 (1895), made quite clear, the United States may sue, not only to protect its property * * but also to protect the general welfare and the interests of all.

Every government, entrusted, by the very terms of its being, with powers and duties to be exercised and discharged for the general welfare, has a right to apply to its own courts for any proper assistance in the exercise of the one and the discharge of the other, and it is no sufficient answer to its appeal to one of those courts that it has no pecuniary interest in the matter. The obligations which it is under to promote the interest of all and to prevent the wrongdoing of one resulting in injury to the general welfare, is often of itself sufficient to give it a standing in court. *Id.*, 584, 15 S.Ct. 906.

*See, also, Cappaert v. United States*, 426 U.S. 128, 96 S.Ct. 2062, 48 L.Ed.2d 523—wherein the United States filed suit to protect Devil's Hole National Monument from injury, and *United States v. Ray*, 423 F.2d 16 (5 Cir. 1970), wherein the United States sought to prevent the construction of coral reefs by private developers.

■ Lack of express congressional authority does not bar the Attorney General of the United States from bringing this suit—he has standing to institute and conduct litigation to protect the rights and properties of the United States.

The defendants' motion to dismiss for lack of standing is denied.

■ Although the Government should not have waited until the buildings in question were under construction before bringing this suit—laches, or neglect on the part of Government officials is no defense to a suit to enforce a public right or protect a public interest. *See Utah Power and Light v. United States*, 243 U.S. 389, 37 S.Ct. 387, 61 L.Ed. 791 (1917), and *Loftus v. Mason*, 240 F.2d 428 (4 Cir. 1957).

Therefore, the defendants' motion to dismiss the suit on laches and/or estoppel is denied.

Although the Attorney General concedes that the United States has no constitutional or statutory right to regulate land use in Rosslyn—he claims the United States, as a Virginia property owner, has the right to question the validity of a nearby zoning that affects its property.

The defendants contend that if the United States has such right, it is time barred by Sections 15.1–496.1 and .3 of the Virginia Code. Those with actual notice may appeal to the Board of Zoning Appeals within 30 days.

To prevent construction of a building in violation of zoning ordinance—

Where a building permit has been issued and the construction of the building for which such permit was issued is subsequently sought to be prevented, restrained, corrected or abated as a viola-) tion of the zoning ordinance, by suit filed within fifteen days after the start of construction by a person who had no actual notice of the issuance of the permit, the court may hear and determine the issues raised in the litigation even though no appeal was taken from the decision of the administrative officer to the board of zoning appeals.

■ As was said by Virginia's Court of Appeals:

[W]here . . . a special use permit has been granted under a zoning classification, a bona fide site plan has thereafter been filed and diligently pursued, and substantial expense has been incurred in good faith before a change in zoning, the permittee then has a vested right to the land use described in the use permit and he cannot be deprived of such use by subsequent legislation. *See Fairfax County v. Medical Structures, Inc.*, 213 Va. 355, 357, 192 S.E.2d 799, 801 (1972).

Although it has been held that the United States is not subject to a state statute of limitations—we need not decide that question because this Court has examined the Gould and Arland Towers zoning and site plan filed, and finds that the actions of the Arlington County Board in approving the said site plans were neither unlawful, arbitrary nor unreasonable.

The Supreme Court of Virginia has repeatedly held that zoning site plan approvals are legislative acts, and that such actions are presumptively valid. *See Byrum v. Board of Supervisors of Orange County*, 217 Va. 37, 225 S.E.2d 369 (1976) and *Bollinger v. Board of Supervisors of Roanoke County*, 217 Va. 185, 227 S.E.2d 682 (1976).

■ The burden of proof is upon the United States to overcome the presumption of validity of the Gould and Arland Towers' site plan approvals—it has failed to so do.

For additional findings in re the Gould and Arland Towers' zoning and site plan approvals, the Court adopts and incorporates herein defendants' proposed findings and conclusions numbered 1 through 6, 8 through 17, 20 through 59, 69 through 73, and 75–75a—conclusions numbered 1 through 10, 12 through 19, 23 and 24.

Further, the United States concedes a declaration of zoning invalidity would only delay the completion of the buildings—the same properties could be rezoned and the same site plans could again be approved by the Arlington County Board.

■ The question for determination in this case is—whether or not the United States can limit the height and bulk of buildings in Rosslyn on the theory of public nuisance.

The Department of Justice contends that any building [in Rosslyn] over 290 feet above sea level or 20 stories would be a visual intrusion on the monumental core of the Nation's Capital—it would seriously impair the beauty of the Nation's Capital as defined in its horizontal nature and its major vistas of major public monuments—both in and from the monumental core.

The material facts are not in dispute—only the inferences to be drawn therefrom.

The monumental core of the Nation's Capital is located on the dominant axis of the federal city, centering on the Mall area.

The seven major monuments, the memorials and edifices in the monumental core are the Capitol building to the east; the Washington Monument, the Lincoln Memorial and the White House to the north; the Jefferson Memorial to the south; and the Arlington Cemetery and the Iwo Jima Memorial to the west.

Washington is a horizontal city; its buildings are of a relatively low, uniform height that follow the contour of the land.

Major visual corridors were created and preserved, such as various specific avenues, the Mall, West Potomac Park and the Ellipse area.

The McMillan Plan of 1901 proposed, in part, that the Mall concept of the L'Enfant Plan be strengthened and expanded by the introduction of the Lincoln Memorial at the terminus of the Mall.

In 1928, the National Capital Parks and Planning Commission proposed a plan for Potomac River parks to be implemented not only in the District of Columbia, but also on the Virginia-Maryland shoreline.

Some forty million people visit the monuments, memorials and public buildings in the monumental core annually.

The original ten-mile square area designated by George Washington as the place for the seat of the national government included what is now known as Arlington County—the land south of the Potomac has been ceded back to Virginia.

The Rosslyn high-rise office buildings are located between Nash Street, Arlington Boulevard, Interstate Route 66 and Arlington Ridge Road on the Virginia side of the Potomac River, facing Georgetown and Roosevelt Island.

The nearest building is some 600 feet from the River.

I–66, Arlington Ridge Road and the George Washington Parkway lie between the high-rises and the River—The AM Building is the tallest building in Rosslyn; it is 333 feet above mean sea level.

When completed, the Rosslyn Center Building will be 351 feet above mean sea level.

The office towers in the Arland Complex are 380 feet above mean sea level, and the Twin Development Building is 362 feet above mean sea level.

The Arland Hotel will be 300 feet above mean sea level, 33 feet lower than the present AM Building, and 51 feet below the Rosslyn Center Building.

The Arland office building will be 29 feet taller than the Rosslyn Center Building. The Twin Development Building will be 11 feet taller.

Both sides introduced a number of photographs taken from different sections of the monumental core looking toward the Rosslyn skyline—many were taken by long-range lenses.

Both sides called expert witnesses—the Government's experts premised their opinions on the height and bulk of the buildings protruding over the tree line on the Virginia Ridge—one said the [high buildings] tend to interfere with the perception of the general visitor to Washington and its immediate area in terms of its historical role as a horizontal city dominated by the dome of the Capitol, and as a pilgrimage site for the great national memorials of this Nation. Another said they would detract from the enjoyment of the basic principal of the plan

developed over the last 100 years, which was, essentially, the radial vistas, the radial street plan, and the horizontal nature of the Capital as a whole within the region. Another said they would dominate the background—all said they would be visual intrusions on the monumental core.

The defendants' experts said the buildings would be unobtrusive and opined that the buildings would not be a public nuisance.

All of the witnesses agreed you could see the tops of the buildings, looking west from the Kennedy Center and Roosevelt Island—looking northwest from the Lincoln Memorial, up river from the Jefferson Memorial and north from Iwo Jima.

The Government offered no evidence to support their public nuisance theory, except the height and bulk of the buildings.

They abandoned their allegations of increased traffic congestion and other environmental damage.

■ A nuisance case is a proceeding in equity—each case involves two inquiries; first, whether the condition complained of is, in fact, a nuisance; and, if a nuisance is found, whether an injunction is the appropriate remedy. *See Harrisonville v. Dickey Clay Co.*, 289 U.S. 334, 53 S.Ct. 602, 77 L.Ed. 1208 (1933).

■ The term "nuisance" is incapable of an exhaustive definition which will fit all cases—it is very comprehensive—it includes everything that endangers life or health, gives offense to the senses, violates the laws of decency, or obstructs the reasonable and comfortable use of property.

The difference between a public and a private nuisance is that the former affects the public at large while the latter affects the individual or a limited number of individuals only.

A public nuisance has been defined as the doing of or the failure to do something that injuriously affects the safety, health, or morals of the public, or works some substantial annoyance, inconvenience or injury to the public generally—*see* Nuisances, 58 Am.Jur.2d.

■ Height alone is not enough—unsightliness or offense to the esthetic senses is not sufficient to constitute a public nuisance. *See City of Newport News v. Hertzler*, 216 Va. 587, 221 S.E.2d 146 (1976), where the appearance of portable toilets and other items of park maintenance distasteful to adjacent residents was an insufficient basis to create a nuisance.

*Florida ex rel. Gardner v. Sailboat Key, Inc.*, 295 So.2d 658 (Fla.App.1974) relied on by the Government to support their theory of esthetic nuisance, states only that a building could be a public nuisance.

■ The imposition of general restrictions on the height of buildings for the safety and convenience of the public is a valid exercise of the police power; but in some instances the erection of high buildings or other ugly objects has been prohibited so that a park or a beautiful public building would not be disfigured by the proximity of such structures.

To sustain such an interference with the use of private land without compensation as an exercise of the police power has been farther than the courts have been willing to go. When, however, compensation is provided, such restrictions may be looked upon as easements, created by statute for the benefit of the land on which the park or public building lies, and which have been taken by the public by eminent domain. *See* 2A J. Sackman Nichol's, The Law of Eminent Domain, Section 7.516[1] at 7–239 (rev. 3d ed. 1976).

These buildings are more than a mile and a half from the Lincoln Memorial and from two-to-three and a half miles from the White House, Washington Monument and the Capitol Building. Viewing them from inside the monumental core, one would not see the Rosslyn high-rise buildings unless he looked in a northwesterly direction.

He would first see the intervening buildings and parks in the District, then the broad expanse of the Potomac and the George Washington Parkway on the Virginia shore.

He could see the buildings from the Iwo Jima Memorial if he turned around and looked toward Rosslyn.

The maximum additional height of any of these buildings over the existing Rosslyn skyline is less than thirty feet.

The Court is satisfied from the evidence presented and from on-site views of Rosslyn from various places in the monumental core, that these buildings would not detract from the average visitor's view of the memorials, monuments and parks of our Nation's Capital.

The United States has failed to prove, that the visual intrusion complained of is, in fact, a public nuisance.

Therefore, the suit should be dismissed, and

It Is So Ordered.

██ If a public nuisance were found, the propriety of an injunction would depend first of all on a showing of substantial injury to the public. Often, even when substantial injury is shown, a balancing of the harm or inconvenience to those injured by the nuisance with the overall harm which would occur if the injunction is granted is undertaken by the courts. *See United States v. Reserve Mining Company*, 380 F.Supp. 11 (D.C.Minn.1974), and cases cited therein.

The harm to the defendants would be great as construction on the Gould Building is well underway—excavation on the Arland Towers property has begun. It is debatable, to say the least, whether an order enjoining the completion of these buildings would be the appropriate remedy.

The Constitution of the United States prohibits the taking of private land for public purposes without just compensation.

Prior to the filing of this suit, the Court has been advised that the Department of Justice has never attempted to control the height or bulk of the buildings erected on private land adjacent to or near the National parks or monuments on a public nuisance theory—heretofore, the United States has always controlled the height of the build-

ings on the Virginia side of the Potomac River by condemning scenic easements.

When a former Secretary of the Interior objected to the height of a proposed building on the Merrywood property, the Government did just that.